FILED
IN OPEN COURT

MAR - 2 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:11cr88 |
| | ) | |
| CATHERINE KISSICK, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The United States and the defendant, CATHERINE KISSICK, agree that had this matter proceeded to trial the United States would have proven the facts set forth in this Statement of Facts beyond a reasonable doubt. Unless otherwise stated, the time periods for the facts set forth herein are at all times relevant to the charges in the Information.

I. <u>Overview</u>

1. The defendant was a senior vice president of Colonial Bank and the head of Colonial Bank's Mortgage Warehouse Lending Division (MWLD). MWLD was located in Orlando, Florida.

2. From in or about 2002 through in or about August 2009, co-conspirators, including the defendant, engaged in a scheme to defraud various entities and individuals, including Colonial Bank, a federally insured bank; Colonial BancGroup, Inc.; shareholders of Colonial BancGroup; the Troubled Asset Relief Program (TARP); and the investing public. One of the goals of the scheme to defraud was to obtain funding for Taylor, Bean & Whitaker (TBW) to assist it in covering expenses related to operations and servicing payments owed to third-party purchasers of loans and/or mortgage-backed

1

securities. Although the defendant did not personally receive funds paid out by Colonial Bank to TBW as a result of the scheme to defraud, she knowingly and intentionally placed Colonial Bank and Colonial BancGroup at significant risk of incurring losses as a result of the scheme and, in fact, caused Colonial Bank to purchase assets from TBW of substantially more than $400 million that in fact had no value and were held on Colonial Bank's and Colonial BancGroup's books as if they had actual value.

II.     Colonial Bank's Purchase of Worthless Assets

3.     In or about early 2002, TBW began running overdrafts in its master bank account at Colonial Bank due to TBW's inability to meet its operating expenses, such as mortgage loan servicing payments owed to investors in Freddie Mac and Ginnie Mae securities, payroll, and other obligations. The defendant and co-conspirators covered up the overdrafts by transferring, or "sweeping," overnight money from another TBW account with excess funds into the master account to avoid the master account falling into an overdrawn status. This sweeping of funds gave the false appearance to other Colonial Bank employees that TBW's master account was not overdrawn. The day after sweeping funds, the conspirators would cause the money to be returned to the other account, only to have to sweep funds back into the master account later that day to hide the deficit again. By in or about December 2003, the size of the deficit due to overdrafts had grown to tens of millions of dollars.

4.     In or about November 2003, the defendant and co-conspirators, including Lee Farkas, the chairman of TBW, caused the deficit in TBW's master account at Colonial Bank to be transferred to "COLB," a mortgage loan purchase facility at MWLD. Through the COLB facility, Colonial Bank purchased interests in individual residential

2

mortgage loans from TBW pending resale of the loans to third-party investors. The purpose of the COLB facility was to provide mortgage companies, like TBW, with liquidity to generate new mortgage loans pending the resale of the existing mortgage loans to investors. The COLB facility was designed such that Colonial Bank would recoup its outlay only after TBW resold a mortgage loan to a third-party investor, which generally was supposed to take place within 90 days after being placed on the COLB facility.

5. In this part of the scheme, which the conspirators called "Plan B," the defendant, Farkas, and other co-conspirators sought to disguise the misappropriations of tens of millions of dollars of Colonial Bank funds to cover up TBW shortfalls or overdrafts of TBW's accounts at Colonial Bank as payments related to Colonial Bank's purchase through the COLB facility of legitimate TBW mortgage loans. The defendant, Farkas, and other co-conspirators accomplished this by causing TBW to provide false mortgage loan data to Colonial Bank under the pretense that it was selling the bank interests in mortgage loans. As the defendant, Farkas, and other co-conspirators knew, however, the Plan B data included data for loans that TBW had already committed or sold to other third-party investors or that did not exist. As a result, these loans were not, in fact, available for sale to Colonial Bank. Whether a Plan B loan was fictitious or owned by a third party, the defendant knew and understood that she and her co-conspirators had caused Colonial Bank to pay TBW for an asset that was worthless to Colonial Bank.

6. Farkas and other co-conspirators at TBW, including the treasurer at TBW, caused the Plan B loan data to be delivered to the defendant and/or other co-conspirators

at Colonial Bank, including an operations supervisor who worked for the defendant and, among other things, kept track of the Plan B loans. The defendant and others caused the Plan B loan data to be recorded in Colonial Bank's books and records to give the false appearance that Colonial Bank had purchased legitimate interests in mortgage loans from TBW through COLB.

7.     To avoid scrutiny from regulators, auditors, and Colonial Bank management of Plan B loans sold to Colonial Bank, the defendant, Farkas, and other co-conspirators devised and implemented a plan that gave the appearance that TBW was periodically selling the Plan B loans off of the COLB facility. In fact, Plan B loans were unable to be sold off of the COLB facility, and the conspirators instead created a document trail that disguised the existence of the Plan B loans.

8.     In or about mid-2005, conspirators caused the deficit created by Plan B to be moved from the COLB facility to MWLD's Assignment of Trade (AOT) facility. The AOT facility was designed for the purchase of interests in pools of loans, which were referred to as "Trades," that were in the process of being securitized and/or sold to third-party investors. The conspirators moved the deficit to the AOT facility in part because, unlike the COLB facility, Colonial Bank generally did not track in its accounting records loan-level data for the Trades held on the AOT facility, thus making detection of the scheme by regulators, auditors, Colonial Bank management, and others less likely.

9.     In an effort to transfer the deficit caused by the Plan B loans on the COLB facility to the AOT facility, the defendant, Farkas, and other co-conspirators caused TBW to engage in sales to Colonial Bank of fictitious Trades purportedly backed by pools of Plan B loans. In fact, the Trades had no collateral backing them. As the defendant and

4

Case 1:11-cr-00088-LMB Document 7 Filed 03/02/11 Page 5 of 11

other co-conspirators knew, Colonial Bank held these fictitious Trades in its accounting records at the amount Colonial Bank paid for them.

10. After moving the Plan B deficit from the COLB facility to the AOT facility, TBW continued to experience significant operating losses. From in or about mid-2005 through in or about 2009, the defendant, Farkas, and other co-conspirators continued to cause TBW to sell additional fictitious Trades to Colonial Bank through the AOT facility. These Trades had no pools of loans collateralizing them. Moreover, the defendant and other co-conspirators caused the creation of false documents to reflect agreements, as required under the AOT facility, for third-party investors to purchase the Trades within a short period of time. This fraudulent AOT funding was typically provided in an ad hoc fashion based on requests from Farkas or other co-conspirators at TBW for, among other reasons, servicing obligations, operational expenses, and covering overdrafts.

11. To obtain the fraudulent AOT funding, Farkas or other TBW co-conspirators would contact the defendant and/or another co-conspirator at Colonial Bank to request an advance from the AOT facility. Generally, the defendant discussed new advances with Farkas before the defendant would release the funds to TBW. Once an advance had been agreed to, TBW co-conspirators caused a wire request to be generated for the funds and provided the defendant and other Colonial Bank co-conspirators with false documentation purporting to represent the sale of pools to Colonial Bank to support the release of the funds. The defendant and her co-conspirators caused the false information to be entered on Colonial Bank's books and records, giving the appearance that Colonial Bank owned a 99% interest in legitimate securities on the

5

AOT facility in exchange for the advances, when in fact those securities had no value and could not be sold.

12. In addition to causing Colonial Bank to hold in its accounting records fictitious AOT Trades with no collateral backing them, the defendant, Farkas, and other co-conspirators caused Colonial Bank to hold in its accounting records AOT Trades backed by assets that TBW was unable to sell, including but not limited to impaired-value loans, charged-off loans, previously sold loans, loans in foreclosure, and real-estate owned (REO) property. The defendant, Farkas, and other co-conspirators also caused the creation of false documents to reflect agreements, as required under the AOT facility, for third-party investors to purchase these impaired Trades within a short period of time.

13. As with the Plan B loans, the defendant, Farkas, and other co-conspirators took steps to cover up the fictitious and impaired Trades on AOT by giving the false appearance that, periodically, the fictitious and impaired Trades were sold to third parties. The conspirators did this by, among other things, engaging in sham sales to hide the fact that the vast majority of assets backing the AOT Trades could not be resold because the assets were either wholly fictitious or consisted of, among other things, impaired-value loans and REO and, in either case, had no corresponding, legitimate commitment to be purchased by third parties. The defendant, Farkas, and other co-conspirators engaged in these sham sales to deceive others, including regulators, auditors, and certain Colonial Bank management.

14. The size of the deficit created by providing fraudulent advances to TBW through Plan B loans and the fictitious AOT Trades fluctuated during the conspiracy, and it reached into the hundreds of millions of dollars. During the course of the conspiracy,

the defendant and other co-conspirators negotiated the transfer of funds to Colonial Bank from TBW bank accounts or lending facilities and obtained other collateral from TBW and Farkas in order to reduce the deficit caused by the Plan B loans and the fictitious AOT Trades. Despite these efforts, the government would prove at a trial that during the course of the conspiracy charged in count one of the Information the defendant and co-conspirators caused Colonial Bank to pay TBW more than $400 million for Plan B loans and fictitious AOT Trades, i.e., loans and Trades that had no value to Colonial Bank. Moreover, the government would prove that some wire transfers of funds by Colonial Bank to TBW for fictitious Plan B loans and AOT securities involved transfers to LaSalle Bank, which had been purchased by Bank of America. Some of these wires were processed from Chicago, Illinois, through a Bank of America server located in Richmond, Virginia.

III. <u>Efforts to Hide Fraudulent Scheme</u>

15. At all times relevant to the Information, the defendant knew that her actions were wrong and not permitted by law. The defendant and her co-conspirators took steps to hide their scheme from regulators, auditors and certain senior Colonial Bank management. Among other things, in May 2009, the defendant deleted electronic communications on her personal Blackberry PDA, and instructed members of her staff to delete communications on their Blackberry PDAs, to evade subpoenas for documents from the Special Inspector General for the Troubled Asset Relief Program that had been served on Colonial Bank and TBW.

## IV. False Financial Statements

16. As part of her duties during the relevant period, the defendant was responsible for certifying the financial results of MWLD to Colonial BancGroup for purposes of incorporating those results into Colonial BancGroup's publicly filed financial statements, including annual reports on Form 10-K and quarterly reports on Form 10-Q filed with the United States Securities and Exchange Commission (SEC). As the government would prove, Colonial BancGroup's Forms 10-K and Forms 10-Q were filed electronically with the SEC's EDGAR Management Office of Information and Technology, in Alexandria, Virginia, during the period set forth in the Information. The defendant and her co-conspirators took steps to hide the fraud scheme described in this statement of facts from Colonial Bank's and Colonial BancGroup's senior management, auditors, and regulators, and Colonial BancGroup's shareholders, including by providing materially false information that significantly overstated assets held in the COLB and AOT facilities. The defendant knew that these actions caused materially false financial data to be reported to Colonial BancGroup and incorporated in its publicly filed statements.

17. For example, in its Form 10-K for the year ending December 31, 2008, which was filed on or about March 2, 2009, Colonial BancGroup reported that MWLD had total assets under management of approximately $4.3 billion, of which approximately $1.55 billion, or 36%, were held as AOT Trades reported as Securities Purchased under Agreements to Resell. In its last Form 10-Q filed with the SEC, for the period ended March 31, 2009, which was filed on or about May 8, 2009, Colonial BancGroup reported that MWLD managed assets valued at approximately $4.9 billion,

8

with approximately $1.6 billion, or approximately 33%, held as AOT Trades reported as Securities Purchased under Agreements to Resell. As the defendant knew, the vast majority of the securities held on AOT at that time were fictitious or impaired and were not under legitimate agreements to be resold to third-party investors.

V. TARP Funding

18. In or about October 2008, Colonial BancGroup submitted an application to the FDIC seeking approximately $570 million in TARP funding under the Capital Purchase Program. In connection with the application, regulators and the United States Treasury Department (Treasury) reviewed Colonial BancGroup's financial data and filings, including the materially false information related to mortgage loan and securities assets held by Colonial Bank's MWLD resulting from the fraudulent conduct of the defendant and co-conspirators. In or about December 2008, Treasury conditionally approved $553 million of TARP funding to Colonial BancGroup if, among other things, Colonial BancGroup could first raise $300 million in private capital.

19. The TARP application submitted by Colonial BancGroup relied on financial statements that included the false financial information described above that was a direct result of the fraud scheme perpetrated by the defendant and co-conspirators. The defendant learned that Colonial BancGroup had submitted a TARP application and understood that the application contained financial information based, in part, on the materially false information described above. The defendant also understood that the United States government considered the financial statements of Colonial BancGroup in determining whether to approve TARP funding. The defendant and co-conspirators assisted Colonial BancGroup in a capital raise to meet TARP's outside funding condition

9

in order to obtain a significant cash infusion into Colonial BancGroup from the United States government, despite knowing that the Colonial BancGroup's application was based on materially false information. Colonial Bank never received TARP funding.

VI. Conclusion

20. The defendant admits that this statement of facts does not represent and is not intended to represent an exhaustive factual recitation of all the facts about which she has knowledge relating to the scheme to defraud as described herein.

21. The defendant admits that her actions, as recounted herein, were in all respects intentional and deliberate, reflecting an intention to do something the law forbids, and were not in any way the product of any accident or mistake of law or fact.

Respectfully submitted,

Denis J. McInerney
United States Department of Justice
Chief
Criminal Division, Fraud Section

By: _____
Patrick F. Stokes
Deputy Chief
Robert A. Zink
Trial Attorney

Neil H. MacBride
United States Attorney

By: _____
Charles F. Connolly
Paul J. Nathanson
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, CATHERINE KISSICK, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate to the best of my knowledge, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Catherine Kissick
Defendant


I am CATHERINE KISSICK's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Kent Sands, Esq.
Attorney for Defendant


_____
Douglas Steinberg, Esq.
Attorney for Defendant