UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA

v.  Case. No. 1:11-CR-00088-LMB

CATHERINE KISSICK

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

**COMES NOW**, Defendant CATHERINE KISSICK, by and through undersigned counsel, and hereby submits this Sentencing Memorandum to assist the Court in the resolution of the sentencing issues in this case.

## Calculation of Loss under U.S.S.G. § 2B1.1

In discussing the calculation of loss, it is important to first identify what Ms. Kissick is not disputing. Ms. Kissick is not disputing that more than the $400 million was paid over to TBW during the course of the conspiracy and that she is criminally responsible for these payments. She also is not disputing that she feared the possibility of significant losses to Colonial Bank resulting from the illegal advances to TBW and that the magnitude of this fear waxed and waned over the course of the conspiracy. Although Ms. Kissick did not intend for the bank or its shareholders to suffer the loss that is recited in the Presentence Report, this does not absolve her of responsibility for loss under United States Sentencing Commission Guidelines Manual ("Guidelines" or "U.S.S.G.") § 2B1.1 (Nov. 2010). Instead, where a defendant does not intend the loss

that actually was incurred, the Guidelines base the loss on the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1, Application Note 3(A)(iv).

The government asserts that the loss that should be imputed to Ms. Kissick under U.S.S.G. § 2B1.1(b)(1) is at least **$550 million**, resulting in an offense enhancement of 30 levels for a fraud involving a loss of more than $400 million. In its response to the draft Presentence Report, the government premised this position on the analysis of Ray Peroutka, the forensic accountant who testified for the government in *United States v. Farkas*.[1] Mr. Peroutka calculated that the total value of the AOT pools recorded on Colonial Bank's books was $1,474,329,017, that the maximum value of the collateral that could be applied against the AOT pools was $922,899,211, and that the difference, **$551,429,805**, represented the "hole" in the AOT. Ex. 700, p. 4.

In calculating at the maximum value of collateral that could be applied against the AOT pools, Mr. Peroutka first identified 12,287 loans that were potential candidates for inclusion as collateral. These loans included 9,304 loans identified by Teresa Kelly as being associated with the AOT, as well as an additional 2,983 loans that were not assigned to any other particular facility at Colonial. Tr. at 1999-2000. Mr. Peroutka then broke these 12,287 loans into five categories (Exhibit 700, p. 3) reproduced below:

| CATEGORY | LOAN COUNT | AMOUNT | LOAN COLLATERAL AMOUNT |
|---|---|---|---|
| Active Loans | 3,910 | $573,082,245 | $573,082,245 |
| REO | 2,099 | $349,816,966 | $349,816,966 |
| Double Sold | 4,016 | $504,347,331 | X |
| Lee Loans | 14 | $4,128,687 | X |

---

[1] Subsequent references in this Sentencing Memorandum to Exhibits ("Ex.") and Transcript ("Tr.") pages are to the corresponding exhibits and transcripts from the Farkas trial.

| Paid in Full     | 1,152  | $159,331,303   | X             |
|------------------|--------|----------------|---------------|
| Charge-Off       | 646    | $56,289,716    | X             |
| Not in Servicing | 990    | $154,516,662   | X             |
| **TOTAL**        | **12,827** | **$1,801,512,909** | **$922,899,211** |

Ms. Kissick has no dispute with the manner in which Mr. Peroutka separated the loans into separate categories, or with the amount allocated to each category. Nor does she dispute Mr. Peroutka's decision not to count the last five categories as proper collateral in Mr. Farkas' case. However, both Ms. Kissick and Teresa Kelly were in a different position than Mr. Farkas and his coconspirators at TBW because they were unaware that these loans were actually being double and triple pledged by TBW to Colonial Bank and other entities, or were already paid in full, or were charged off or not in service.

Ms. Kissick's and Ms. Kelly's lack of knowledge was confirmed at Mr. Farkas' trial not just by Ms. Kissick and Ms. Kelly, but also by TBW employee and cooperating defendant Desiree Brown. Ms. Brown testified that Ms. Kissick and/or Ms. Kelly would sometimes be informed of particular paid in full, charged off or not in service loan, and upon being so notified, Ms. Kissick would require TBW to pay Colonial Bank off for the defective loan. Tr. at 1619. The TBW solution to this problem was simply not to tell Ms. Kissick and Ms. Kelly about defective loans, for the simple reason, as Ms. Brown succinctly puts it, "that we didn't have the money to pay them back." Tr. at 1620. Teresa Kelly confirmed this in her own testimony, noting that anytime TBW notified them about a paid in full loan, "[t]he individual loan would have to be removed from AOT, and TBW would have to give back the money." Tr. at 498. Ms. Kelly testified that the same was true for charged off loans. Tr. at 499.

As for the double and triple pledged loans, there is no suggestion anywhere in the record that Ms. Kissick and Ms. Kelly knew about the TBW scheme to finance its business by pledging the same loans to multiple financial institutions. On the contrary, Ms. Kelly was quite clear in her testimony that if a loan pledged to another institution was identified, TBW would have to repay Colonial Bank for the loan and the loan could not remain on the AOT. Tr. at 499.

Based on the foregoing, Ms. Kissick should be given credit for the loans in the categories "Double Sold", "Paid in Full", "Charge Off" and "Not in Servicing" for the simple reason that she knew nothing about these defects in the loans. Ms. Kissick acknowledges that a total collateral amount considerably in excess of the total book value of the AOT pools is itself misleading. Mr. Peroutka included loans in collateral at the face value that should have been discounted in value to varying extents. Tr. at 2003. Teresa Kelly did just this in assessing the value of much of the collateral that was being provided by TBW, applying a significant discount to some loans, such as the aged or "crap" loans that were discussed at the Farkas trial. Ms. Kelly, who was keeping track of the Plan B hole in the AOT, testified that there was in fact a hole in the AOT which amounted to approximately $500 million at the time of the closure of the Bank in August of 2009. Tr. at 479.

Ms. Kelly's calculation of a $500 million hole was based only on what was actually contained on the AOT and did not take into account the value of the additional 2,983 loans that Mr. Peroutka identified in his analysis as potential collateral not associated with the AOT or any other Colonial facility. She also did not take into account the value of loans and other collateral provided by Lee Farkas and TBW which

remained on the bank's Overline facility at the time of the bank's closure (which was specifically excluded from Mr. Peroutka's analysis). Ms. Kissick testified that the Mortgage Warehouse Lending Agreement provided for a cross-collateralization of all of Colonial's facilities so, for example, collateral maintained on the Overline could be applied against debts owed on COLB and AOT. Many of the loans on the AOT were previously collected on Colonial Bank's Overline facility as collateral to help cover the hole in the AOT. In August of 2009, loans still remained on the Overline facility. A variety of other collateral also was assigned to the Overline facility, including a security interest in TBW's retained right to service home mortgages, REO properties, and even the rights to Mr. Farkas' controlling interest in the stock in TBW, which in late 2002 she asked Mr. Farkas to sell to pay of his debt to Colonial. He declined. See Kissick email to Farkas, Ex. 1-73, Tr. at 779-780. At that time, Ms. Kissick believed that Mr. Farkas' 51% stock interest had been valued at $100-120 million. See Kissick 11/8/2002 email to Lee Farkas and Bill Higgins, Ex. 1-13, Tr. at 782-783. Mr. Farkas later increased his ownership interest to 79% of the TBW stock, all of which was pledged as collateral to Colonial Bank.

From Ms. Kissick's perspective, the single most important piece of collateral on the Overline was Colonial Bank's security interest in TBW's servicing rights. A major portion of the value of TBW's business was in its retained rights to service home mortgages, and as, she testified at Mr. Farkas' trial, she believed that this could provide a source of funds to pay off the Plan B hole. Tr. at 807. The servicing rights were valued in TBW's May 31, 2009 Financial Statement at $750 million. See page 10 of Exhibit A to Defendant's PSR objections. As Teresa Kelly has testified, the potential sale of the

servicing rights was a frequent subject of discussion with Mr. Farkas from early on, and he repeatedly claimed he was going to finance the MSRs to pay back the Plan B hole. Tr. At 416-417. On one occasion where TBW did follow through and sell some its servicing rights, TBW paid over $40-$60 million to Colonial Bank to pay down the Plan B hole (in typical fashion, they had promised $100 million). Teresa Kelly testimony, Tr. at 478. Colonial Bank possessed a first lien on some of the servicing rights and a second lien on all of the servicing rights, and TBW's May 31, 2009 Financial Statement reflects that the holder of the first lien had extended only $63 million secured by the their lien, with an additional $211 million already serving as security for a working capital line provided by Colonial. See last page of Exhibit A to Defendant's PSR objections. As of May 31, 2009, this consequently left $476 million in servicing rights to potentially protect the bank against other losses.

These are matters that have been discussed with the attorneys for the government before, and they have made the rebuttal that the credit extended by Colonial Bank and secured by the servicing rights had reached its limit precisely because the Bank had made its own management decisions about the amount of credit that could safely be extended based on the appraised value of the servicing rights. The government would be right to point out that Ms. Kissick had no authority or justification to substitute her own judgment for the judgment of executive management in Montgomery, Alabama about the amount of credit that Colonial Bank could safely extend. Nevertheless, the servicing rights, along with the other collateral which was placed on the bank's Overline facility, did play a role in Ms. Kissick's own sense of the risk to which she believed she was exposing the bank.

With regard to the individual loans remaining on the Overline facility, counsel for the government has informed defense counsel that the FDIC and Navigant have worked out a settlement as to the value of many of the loans on the Overline facility, and the government is attempting to obtain this information. Defense counsel does not know the value of the 2,983 loans identified by Mr. Peroutka that were not on the AOT or the Overline or the value of REO properties maintained on the Overline. It is the understanding of defense counsel that in the wake of the demise of TBW, its once valuable servicing rights are now worthless. The defense assumes that the same is true of Mr. Farkas' stock in TBW.

Because of the unknown values discussed above, it is impossible for Ms. Kissick to tell the Court a specific amount of loss that she reasonably should have known was a potential result of the offense. For this reason, Ms. Kissick has decided to provide the Court with specific facts and analysis that might assist the Court in making its own determination. Ms. Kissick understands that it is quite possible that the analysis set forth above will have little effect on the determination of her actual sentence given the application of other guidelines factors and the overall high guidelines scoring for her offense. It is not the intention of the defense to minimize Ms. Kissick's culpability or to split rhetorical hairs. We are simply trying to present an accurate picture of the overall offense for the Court.

**Ms. Kissick's Substantial Assistance**

Ms. Kissick began her assistance in August of 2009, without the benefit of counsel, upon first being confronted by government investigators. Over the course of the next 1 ½ years, she attended extensive debriefings both in Orlando and Alexandria and

worked long hours with counsel to recover a substantial amount of evidence in the form of retained PINS and emails that were produced for the government and used in the prosecution of Mr. Farkas. Having presided over Mr. Farkas' trial, the Court is obviously well positioned to make its own judgment about Ms. Kissick's importance in the successful prosecution and conviction of Mr. Farkas.

The course of Ms. Kissick's cooperation was not always smooth and Ms. Kissick occasionally frustrated investigators and prosecutors with her perceived reluctance to fully come to terms with the extent of her capitulation to the demands of Mr. Farkas. Much of this frustration was justified. Ms. Kissick was not previously aware that her own Department had been the unwitting victim of a massive double and triple pledging scheme by Mr. Farkas, and she struggled to come to terms with the dimensions of the offense and her role in it. Ms. Kissick also tended to focus on questions of motive and was herself occasionally frustrated by what she perceived as the government's lack of interest in her efforts to collect collateral to offset the Plan B hole. The occasional rough spots in Ms. Kissick's cooperation always tended to coalesce around this issue, with the government understandably focused on the legal elements of the offense and Ms Kissick focused on the sort of motive issues that make sense to the layperson and are the province of sentencing.

There was also a learning curve for the government. When defense counsel first became involved in the case, it appeared that the investigators still suspected that Ms. Kissick's involvement must somehow have been even more extensive and motivated at least in part by some illicit gain. The truth, that Ms. Kissick had gratuitously mired herself in a massive bank conspiracy in which the fraud perpetrated by TBW against her

Department actually dwarfed the fraud in which she participated, was initially hard to imagine. Fortunately for Ms. Kissick, the extensive trail of contemporaneous email communications confirmed the true facts of the case.

### **Variance from Guidelines**

The U.S. Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005) freed District Court Judges to consider non-guidelines factors in fashioning a reasonable sentence. The U.S. Sentencing Guidelines are now advisory and appellate review of sentencing decisions is limited to determining whether they are reasonable. The abuse of discretion standard now applies to appellate review of sentencing decisions, regardless of whether the sentence is inside or outside the guideline range. *Gall v. United States*, 552 U.S. 38 (2007). If the sentence is outside the guideline range, the appellate court may not apply a presumption of unreasonableness. The appellate court may consider the extent of the deviation, but must give due deference to the district court's decision that the factors set forth in 18 U.S.C. § 3553, on the whole, justify the extent of the variance. The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.

In *Pepper v. United States*, 131 S. Ct. 1229 (2011), the Supreme Court confirmed the broad scope of the evidence that a district court may consider in determining a defendant's sentence:

> Consistent with the principle that "the punishment should fit the offender and not merely the crime," *Williams* v. *New York*, 337 U.S. 241, 247, 69 S. Ct. 1079, 93 L. Ed. 1337, this Court has observed a consistent and uniform policy "under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to

>     assist him in determining the kind and extent of punishment to be imposed within limits fixed by law," 337 U.S., at 246, 69 S. Ct. 1079, 93 L. Ed. 1337, particularly "the fullest information possible concerning the defendant's life and characteristics," 337 U.S., at 247, 69 S. Ct. 1079, 93 L. Ed. 1337. That principle is codified at 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct," and at § 3553(a), which specifies that sentencing courts must consider, among other things, a defendant's "history and characteristics," § 3553(a)(1). The Guidelines, which *Booker* made "effectively advisory," 543 U.S., at 245, 128 S. Ct. 586, 169 L. Ed. 2d 445, "should be the starting point and the initial benchmark," but district courts may impose sentences within statutory limits based on appropriate consideration of all of the § 3553(a) factors, subject to appellate review for "reasonableness," *Gall* v. *United States*, 552 U.S. 38, 49-51, 128 S. Ct. 586, 169 L. Ed. 2d 445**.** This sentencing framework applies both at initial sentencing and at any subsequent resentencing after a sentence has been set aside on appeal. Pp. 9-12.

*Pepper v. United States*, 131 S. Ct. at 1233 (holding that even post-sentencing rehabilitation may properly be considered at a re-sentencing).

18 U.S.C. § 3553(a) lists seven factors that a sentencing court must consider. These factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed–(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the advisory guideline range; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to

any victims of the offense. 18 U.S.C. § 3582(a) provides that the Court shall consider the applicable § 3553(a) factors "recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."

Set forth below are specific issues which the defense believes deserve special attention under § 18 U.S.C. § 3553.

### **Ms. Kissick's lack of intent to harm the bank or its shareholders**

Ms. Kissick did not intend to cause the loss for which she is being held accountable in the PSR. By limiting the computation of loss in § 2B1.1 to loss that that the defendant reasonably should have known was a potential result of the offense, the Sentencing Guidelines provide some leniency for defendants who do not intend the loss that results from their conduct. However, there remains that relatively unusual category of defendants who cause losses that they reasonably should have foreseen but did not wish to bring about through their actions. The Court might determine that Ms. Kissick falls into this category and correspondingly impose a large offense enhancement under § 2B1.1 for the amount of loss. In such a case, it would be appropriate for the Court to impose a downward variance from the Guidelines to distinguish Ms. Kissick from defendants who intend the loss that results from their conduct.

### **Ms. Kissick's motives**

Ms. Kissick did not receive any kickbacks or other improper gratuities from Lee Farkas or TBW in return for her actions. There is nothing in the record to suggest that she was motivated to commit the offense by the promise of financial gain. She first became involved in the "sweeping" of the investor funds only after one of her subordinates told her that sweeping had already been going on for about three weeks

(Kissick testimony, Tr. at 763), and she only authorized continued sweeping after discussing the matter with her immediate superior at Colonial Bank. Tr. at 764-765. Even when she embarked on Plan B in 2003 without the knowledge or approval of any superior at Colonial Bank, she made clear in her e-mails to Lee Farkas and others at TBW that it was intended solely to be a short term mechanism to test Mr. Farkas' contention that TBW's cash shortages were the result of bookkeeping errors at Colonial Bank. Tr. at 792-793, 797-799, 800-801; Kissick 11/25/2003 email to Farkas, Gov. Ex. 1-104; Kissick 12/3/2003 email to Farkas, Gov. Ex. 1-106. Unfortunately, Mr. Farkas' claim was soon disproved and Ms. Kissick realized too late that she had dug a hole that she could not dig out of without exposing herself and her Department.

The issue of motive is a crucial factor that differentiates Ms. Kissick and Ms. Kelly from Lee Farkas, and to a lesser extent, the other TBW defendants. There is no evidence that Ms. Kissick and Ms. Kelly set out to harm the bank. On the contrary, their downfall was precipitated at least in part by a desire to allow Colonial Bank to sustain one of the Bank's most important clients, a company that was generating hundreds of millions of dollars in interest income for the Bank. Brown testimony, Tr. at 1723.

**Ms. Kissick's professional history**

Over her 25 years of banking, Ms. Kissick dealt with hundreds of individual and institutional customers and conducted herself ethically and responsibly. Until her association with Lee Farkas and TBW, she appears to have been a model of professionalism, as attested to by prior clients and business associates who, knowing the seriousness of the charges against her, have nevertheless written letters on her behalf attesting to her good character. See letters attached to PSR. These letters portray a

woman who was not just liked within the industry, but was greatly admired and respected, both professionally and personally.

### Ms. Kissick's voluntary termination of Plan B advances

Although it came five years too late, the Plan B advances ended not in August of 2009 with the execution of the FBI's search warrant in August of 2009, but a little over a year earlier in July of 2008 when Ms. Kissick simply put her foot down and said no more. Teresa Kelly testimony, Tr. at 480.

### The causes of Colonial Bank's failure

Under the PSR, Ms. Kissick's Sentencing Guidelines offense level is substantially increased by the determination that the offense substantially jeopardized the safety and soundness of a financial institution and the determination that the offense involved more than 250 victims (the bank shareholders who bought or sold stock during the time period of the conspiracy). Ms. Kissick is not disputing the applicability of these Sentencing Guidelines enhancements. However, for variance purposes, it should be noted that explanation for the failure of Colonial Bank and the subsequent losses of its shareholders is extremely complicated and involves several different causes. The Alabama State Banking Department has concluded that "although the MWL [Ms. Kissick's Mortgage Warehouse Lending department] operations caused significant losses, the commercial real estate and ADC [acquisition, development and construction] exposures would have brought down the bank by themselves." See <u>Material Loss Review of Colonial Bank, Montgomery, Alabama</u>, April 2010 Report of the FDIC's Office of the Inspector General (OIG), page 24, attached as B to Defendant's PSR Objections.

The OIG Report paints a complicated picture of the demise of Colonial Bank that includes many factors that had nothing to do with Ms. Kissick's MWL division. The OIG Report concludes that Colonial Bank failed due to a liquidity crisis brought on by (1) bank management's failure to implement adequate risk management practices pertaining to its significant concentrations in ADC loans and investments in higher-risk, mortgage-backed securities; (2) deficiencies in loan underwriting, credit administration, and risk analysis and recognition; and (3) an alleged fraud affecting its MWL operation.

### Ms. Kissick's lack of benefit from acceptance of responsibility

The Presentence Report suggests that Ms. Kissick should receive an acceptance of responsibility adjustment, but based on the PSR's calculation of the guidelines, Ms. Kissick would receive no net benefit from the adjustment because of the application of the statutory maximum.

### Ms. Kissick's voluntary agreement to civil penalties

Even before pleading guilty in this case, Ms. Kissick agreed to the entry of a civil judgment by this Court in *Securities and Exchange Commission v. Catherine L. Kissick*, 1:11-cv-00215-LMB-JFA, whereby she is prohibited from acting as an officer or director of any publicly traded company, from serving in any senior management or control position at any mortgage-related company or other financial institution, and from holding any position involving financial reporting or disclosure at a public company. She may also be subject to civil penalties. Under the Plea Agreement in this case, Ms. Kissick also agreed to consent to the FDIC's an Order of Prohibition from Further Participation in any manner in the affairs of a financial institution or from enumerated other actions in

connection such an institution. As a result, she has effectively already forfeited her 25 year career in the banking industry.

### Ms. Kissick's personal background and circumstances

In addition to the letters from business colleagues discussed above, the defense has provided the Court with a number of letters from family members and friends. See letter attached to PSR. The writers provide a compelling description of a caring wife and mother, a thoughtful friend and a generous community volunteer who has tirelessly worked for a variety of charities. Ms. Kissick has also been an enthusiastic supporter and organizer for her children' sports teams, serving as a Little League Treasurer and then as Little League President, even after her sons had already graduated from the organization, and doing whatever is necessary to promote and support local lacrosse leagues and their players. What is clear from these letters is that Ms. Kissick has had a very positive impact throughout the Central Florida community. Of course, Ms. Kissick's most important impact has been within her own family, in the lives of her husband and children. These are matters of a very personal nature that will not be addressed in a public filing, but which merit the Court's special attention. A few of the letters that have been attached to the PSR discuss these issues in some detail and should suffice to inform the Court of the situation.

### Conclusion

The defendant respectfully submits that there are a number of factors that strongly support a non-guidelines sentence in this case. The nature and circumstances of the offense and the history and characteristics of the defendant, as well as the future employment injunctions the have already been imposed, all support the conclusion that

specific deterrence is simply not an issue. The crucial distinction between the motives of Ms. Kissick and the motives of the TBW defendants, as well as the huge disparity in the dollar volume of the fraud with which they are respectively associated, also would warrant the Court in imposing a corresponding disparity in sentencing. Ms. Kissick understands the gravity of her offense and the fact that the Judge must consider the seriousness of the offense and the issue of general deterrence in imposing sentence. However, a sentence that does not take into account the massive fraud that was perpetrated on Colonial Bank by TBW independent of Plan B and the mitigating aspects of Ms. Kissick's own motives would not do justice in this case.

Respectfully submitted this 12th day of June, 2011.

**s/Kenton V. Sands**_____ ____
Counsel for Defendant
Fla. Bar # 0788708
SANDS WHITE & SANDS, P.A.
760 White Street
Daytona Beach, Florida 32114
Phone: (386) 258-1622
Fax:    (386) 238-3703
E-mail: kent@sandswhitesands.com


_____/**s**/_____

Douglas A. Steinberg
VSB # 39333
Attorney for Ms. Kissick
Law Offices of Douglas A. Steinberg
107 North Payne Street
Alexandria, Virginia  22314
Tel (703) 683-5328
Fax (703) 684-1482
**dasteinberg@verizon.net**

**CERTIFICATE OF SERVICE**

   I hereby certify that, on this 12th day of June 2011, a true and accurate copy of the foregoing was electronically filed and served via the Court's CM/ECF system to:

Charles F. Connolly Esq.
Paul J. Nathanson Esq.
Assistant United States Attorney
Eastern District of Virginia
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Ph: 703.299.3700
Fax: 703.299.3981
Charles.Connolly@usdoj.gov

&

Patrick F. Stokes Esq.
Deputy Chief
Robert A. Zink Esq.
Trial Attorney
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Ph: (202) 305-4232
Fax: (202) 514-7021
Patrick.stokes2@usdoj.gov


_____/s/_____
Douglas A. Steinberg
VSB # 39333
Attorney for Ms. Kissick
Law Offices of Douglas A. Steinberg
107 North Payne Street
Alexandria, Virginia 22314
Tel (703) 683-5328
Fax (703) 684-1482
dasteinberg@verizon.net