UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA

v.  Case. No. 1:11-CR-00088-LMB

CATHERINE KISSICK  Hearing Date: August 9th 2011
_____/

## POSITION OF THE DEFENDANT
## WITH RESPECT TO RESTITUTION

**COMES NOW**, Defendant CATHERINE KISSICK, by and through undersigned counsel, and hereby submits this Position of the Defendant With Respect to Restitution.

### Losses allocable to Ms. Kissick's involvement in Plan B

### Colonial Bank's $500 million loss

The government has properly taken the position that Ms. Kissick's restitution calculation should not include the full amount of the Plan B losses assigned to the TBW defendants (except Ray Bowman) for the same reason explained in Ms. Kissick's Sentencing Memorandum, namely, that neither Ms. Kissick nor Ms. Kelly knew of the REO, double-sold, charged-off and paid-in-full loans that TBW was selling to AOT. Instead, the government has included only the approximately $500 million that Teresa Bowman testified at trial represented the "hole" in the AOT. This represents the difference between the amount of funds that were improperly paid over to TBW pursuant to Plan B and what Ms. Kelly believed was the value of the offsetting collateral from TBW that had been slotted into the AOT.

The problem with this approach is that the collateral that Ms. Kelly took into account in her calculation of the $500 million hole was based only on what was actually

contained on the AOT and did not take into account the value of the additional 2,983 loans that the government's expert witnesss, Ray Peroutka, identified as potential collateral not associated with the AOT or any other Colonial facility.  Nor did Ms. Kelly's approximation take into account the value of loans and other collateral provided by Lee Farkas and TBW which remained on the bank's Overline facility at the time of the bank's closure (which was specifically excluded from Mr. Peroutka's analysis).

Ms. Kissick testified that the Mortgage Warehouse Lending Agreement provided for a cross-collateralization of all of Colonial's facilities so, for example, collateral maintained on the Overline could be applied against debts owed on COLB and AOT. Many of the loans on the AOT were previously collected on Colonial Bank's Overline facility as collateral to help cover the hole in the AOT.  In August of 2009, loans still remained on the Overline facility. A variety of other collateral also was assigned to the Overline facility, including a security interest in TBW's retained right to service home mortgages, REO properties, and even the rights to Mr. Farkas' controlling interest in the stock in TBW, which in late 2002 she asked Mr. Farkas to sell to pay of his debt to Colonial.  He declined.  See Kissick email to Farkas, Ex. 1-73, Tr. at 779-780.  At that time, Ms. Kissick believed that Mr. Farkas' 51% stock interest had been valued at $100-120 million.  See Kissick 11/8/2002 email to Lee Farkas and Bill Higgins, Ex. 1-13, Tr. at 782-783.  Mr. Farkas later increased his ownership interest to 79% of the TBW stock, all of which was pledged as collateral to Colonial Bank.

With regard to the individual loans remaining on the Overline facility, counsel for the government has informed defense counsel that when the TBW Settlement Agreement

with the FDIC was entered into in September 2010, it was agreed that 573 loans, having an unpaid principal balance of $87,322,742, served as collateral under the Overline Facility. These loans are reportedly owned by TBW, but are subject to the FDIC's perfected security interest to secure the outstanding balance under the facility (about $16 million). Since that time, a small number of loans have been paid off or sold. Defense counsel does not know the value of the 2,983 loans identified by Mr. Peroutka that were not on the AOT or the Overline or the value of REO properties maintained on the Overline. It is the understanding of defense counsel that in the wake of the demise of TBW, its once valuable servicing rights are now worthless. The defense assumes that the same is true of Mr. Farkas' stock in TBW.

### Stockholder victims' $524,882 loss

The government has taken the position that restitution is appropriate for the 17 individuals and entities who have provided documentation demonstrating that they owned Colonial BancGroup stock on August 3, 2009, the date federal agents executed search warrants on Colonial Bank. The amount of restitution is calculated based on the fall in stock price from August 3, 2009 through August 18, 2009 (the next trading day after which the FDIC was appointed receiver of Colonial Bank).

The defense does not dispute that these individuals and entities are victims within the meaning of the Sentencing Guidelines, and the government's basic methodology for approaching this issue is sound. See, e.g., *United States v. Ebbers*, 458 F.3d 110 (2nd Cir. 2006), where the 2nd Circuit affirmed a sentence based on a determination of loss calculated as the drop in WorldCom stock price from 83 cents a share prior to the public disclosure of its improper accounting methods to 6 cents a share after the disclosure.

4

However, the government's analysis fails to take into account the fact that Colonial Bank was likely destined for imminent bankruptcy regardless of the revelation of the fraud and for reasons having nothing to do with the fraud. For example, the Alabama State Banking Department has concluded that "although the MWL [Ms. Kissick's Mortgage Warehouse Lending department] operations caused significant losses, the commercial real estate and ADC [acquisition, development and construction] exposures would have brought down the bank by themselves." See <u>Material Loss Review of Colonial Bank, Montgomery, Alabama</u>, April 2010 Report of the FDIC's Office of the Inspector General (OIG), page 24, attached as B to Defendant's PSR Objections.

The OIG Report paints a complicated picture of the demise of Colonial Bank that includes many factors that had nothing to do with Ms. Kissick's MWL division. The OIG Report concludes that Colonial Bank failed due to a liquidity crisis brought on by (1) bank management's failure to implement adequate risk management practices pertaining to its significant concentrations in ADC loans and investments in higher-risk, mortgage-backed securities; (2) deficiencies in loan underwriting, credit administration, and risk analysis and recognition; and, finally, (3) the fraud affecting the MWL operation.

It is not the intent of the defense to minimize or discount the real losses suffered by the Colonial BancGroup shareholders. However, those shareholders would suffer a disservice if, as a result of this case, there were left with the mistaken belief that that the failure of Colonial Bank and their consequent losses were simply the result of an isolated fraud in the MWL operation. The truth is much more complicated, implicating serious

systemic failures in risk management practices, not just at Colonial Bank, but in the mortgage lending industry generally.

For the foregoing reasons, the defense submits that an analysis that attributes responsibility for 100% of the stock loss to the public disclosure of the FBI raid is inaccurate because, even in the absence of the raid, the ultimate failure of the bank would have likely rendered the stock valueless.

### Apportionment of loss among Defendants

The government has taken the position that the loss attributable to Plan B (calculated differently for two sets of defendants as discussed above) and the Colonial BancGroup shareholder loss of $524,882 should be jointly and severally borne by the defendants. This is not mandated under the law. 18 U.S.C. § 3664(h) provides that "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." The 4th Circuit Court of Appeals has interpreted this provision consistent with its plain meaning: "18 U.S.C. § 3664(h) explicitly gives a district court discretion as to whether joint and several liability should apply or whether liability should be apportioned among the defendants based on their economic circumstances and their respective contributions to the victim's losses." *United States v. Squirrel*, 588 F.3d 207, 212 (4th Cir., 2009).

**The level of contribution to the victim's loss**

Although their participation in Plan B cannot be excused, Ms. Kissick and Ms. Kelly did not intend to harm Colonial Bank and, unlike all of the rest of the defendants, they neither sought nor received any illegal compensation for their actions. If Mr. Farkas had been dealing honestly with them, he would have done just what he repeatedly promised to do – make good the bank's advancement of funds to TBW by providing Colonial Bank with an equivalent amount of collateral. Instead, the evidence now shows that he was secretly running a separate and much larger scheme of his own against Colonial Bank and other financial institutions, a scheme which involved, *inter alia*, the double and triple pledging of loans to these institutions. This was a sort of mortgage-based Ponzi scheme that was destined to implode at some point. As the government has pointed out, Mr. Farkas led Colonial Bank (and Ms. Kissick) to believe that the Bank owned approximately $900 million in loans that had actually already been sold to Freddie Mac. There is every reason to believe that is Plan B had never occurred, TBW would simply have relied on its double pledging scheme to achieve the same objectives. In fact, when Ms. Kissick finally put her foot down and stopped any more AOT Plan B advance in mid-2008, this did not stop the fraud. TBW simply continued it through the double pledging scheme, substantially increasing its double pledging on the COLB facility.

If this had not been the case, if Plan B had really been just what Mr. Farkas represented it to be – a stopgap measure to obtain financing while glitches in the accounting were resolved – Colonial Bank's Plan B losses, if any, would have been

vastly reduced. For this reason, the lion's share of the responsibility for the Plan B losses should be assigned to Mr. Farkas.

### The economic circumstances of the Defendant

Ms. Kissick has worked in the banking industry for 25 years, all of her adult working life. She is 50 years old. She faces the prospect of spending the next 6 ½ years in prison, followed by a few months of halfway house detention. Based on those figures, when she emerges from custody, she will be a 57 year old convicted felon whose only work experience is in an industry from which she has now been banned.

Ms. Kissick has already agreed to the entry of a civil judgment by this Court in *Securities and Exchange Commission v. Catherine L. Kissick*, 1:11-cv-00215-LMB-JFA, whereby she is prohibited from acting as an officer or director of any publicly traded company, from serving in any senior management or control position at any mortgage-related company or other financial institution, and from holding any position involving financial reporting or disclosure at a public company. She may also be subject to civil penalties. Under the Plea Agreement in this case, Ms. Kissick also agreed to consent to the FDIC's an Order of Prohibition from Further Participation in any manner in the affairs of a financial institution or from enumerated other actions in connection such an institution. Even without the aforementioned consent judgment and order, Ms. Kissick would be a pariah in the banking industry, a point recently made clear by SunTrust and UBS, which in the wake of her sentencing directed her to remove her accounts from their banks.

Ms. Kissick has lived for the last 15 years in a home that she and her husband purchased in 1996 for $169,000. She does not own expensive cars, or airplanes, or boats,

8

or second homes in exotic locales. Her children do not attend expensive private schools. As the Court is aware from the PSR, almost all of the family's savings are invested in a few retirement accounts. As further detailed in the PSR, there are also personal family health issues which make the family's economic future even more uncertain.

### Conclusion

For the reasons stated herein, the defense respectfully requests that the Court consider the effect of the offsetting collateral in determining the amount of restitution payable by Ms. Kissick to the FDIC, consider reducing her restitution to stockholders to take into account the other causes of the bank's failure, and in apportioning the restitution among defendants, and that the Court take into account the mitigating factors that exist with regard to the Colonial Bank employee-defendants, as well as Ms. Kissick's limited financial resources, lengthy incarceration, bleak job prospects thereafter, and the other personal issues involving her family.

Respectfully submitted this 5th day of August, 2011.

s/Kenton V. Sands_____
Attorney for Ms. Kissick
Fla. Bar # 0788708
SANDS WHITE & SANDS, P.A.
760 White Street
Daytona Beach, Florida 32114
Phone: (386) 258-1622
Fax: (386) 238-3703
E-mail: kent@sandswhitesands.com

_____/s/_____
Douglas A. Steinberg
VSB # 39333
Attorney for Ms. Kissick
Law Offices of Douglas A. Steinberg
107 North Payne Street
Alexandria, Virginia 22314

Tel (703) 683-5328
Fax (703) 684-1482
**dasteinberg@verizon.net**

## CERTIFICATE OF SERVICE

I hereby certify that, on this 5th day of August 2011, a true and accurate copy of the foregoing was electronically filed and served via the Court's CM/ECF system to:

Charles F. Connolly Esq.
Paul J. Nathanson Esq.
Assistant United States Attorney
Eastern District of Virginia
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Ph: 703.299.3700
Fax: 703.299.3981
Charles.Connolly@usdoj.gov

&

Patrick F. Stokes Esq.
Deputy Chief
Robert A. Zink Esq.
Trial Attorney
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
Ph: (202) 305-4232
Fax: (202) 514-7021
Patrick.stokes2@usdoj.gov

_____/s/_____
Douglas A. Steinberg
VSB # 39333
Attorney for Ms. Kissick
Law Offices of Douglas A. Steinberg
107 North Payne Street
Alexandria, Virginia 22314
Tel (703) 683-5328
Fax (703) 684-1482
dasteinberg@verizon.net